UNITED STATES of America,
Plaintiff-Appellee,

v.

Elton K. FEFFER and Richard R. Alter, Defendants-Appellants.

No. 86–2499.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1987.

Decided Sept. 22, 1987.

Rehearing and Rehearing En Banc
Denied Nov. 30, 1987.

Robert E. Meldman, Meldman Case & Weine Division, Muleahy & Wherry, S.C., Milwaukee, Wis., for defendants-appellants.

Barbara B. Berman, Asst. U.S. Atty., Patricia Gorence, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before WOOD and FLAUM, Circuit Judges, and GRANT, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

In her last few months as an employee at Continental Plastics Corporation (Continental), Diane Langron turned over company documents to the Internal Revenue Service (IRS) on four occasions. The documents were later used by the IRS to help convict each of the two owners of Continental, Richard Alter and Elton Feffer, of one count of conspiring to defraud the United States with respect to income taxes, in vio-

lation of 18 U.S.C. § 371. Feffer was additionally convicted of two counts of subscribing to a false corporate income tax return, in violation of 26 U.S.C. § 7206(1). Prior to trial, the defendants moved to suppress the documents claiming that they were obtained through an unreasonable search in violation of the fourth amendment. The court denied their motion and they now appeal.

## I. BACKGROUND

At the supression hearing,[1] Diane Langron testified that during most of her nearly seven years at Continental she and her immediate supervisor, Elton Feffer, enjoyed an amicable working relationship. Starting out as an administrative assistant, Langron's responsibilities increased until she was in charge of the company's accounts payable, accounts receivable, and purchasing. Her duties required her to prepare various export documents and bills of lading on foreign shipments, some of which were not being reported on Continental's books. The proceeds of these unreported sales were instead being diverted to Alter and Feffer.

Langron testified that in the fall of 1981 she began to worry about being held responsible for signing false documents on behalf of Continental. She claimed that her fears prompted her to anonymously call the IRS that October. IRS officials immediately confirmed Langron's fears, but it was not until December 1981 that she called the IRS again and revealed her identity. During the second call, she spoke with a special agent from the Criminal Investigation Division and made plans to meet with him within the next few days. On December 17, 1981, Agents Collins and Miller came to Langron's home to discuss

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. The parties had initially stipulated that all evidence relating to the motion to suppress would be presented in the form of transcripts of testimony and exhibits from a prior IRS summons enforcement hearing. Based on this evidence, Magistrate Bittner determined that the defendants had no expectation of privacy in the records Langron turned over to the IRS and therefore recommended that the district court deny the motion. In the meantime, government counsel informed the defendants that Langron had perjured herself during the prior hearing and the defendants immediately moved to withdraw the stipulation and for an evidentiary hearing on the suppression motion. A suppression hearing was subsequently held just prior to trial.

her concerns. During this meeting, Langron provided the agents with Continental documents and the agents, in turn, told Langron about becoming a numbered informant and about the rewards for which she could apply. Langron testified that she met with the IRS agents several more times between December 1981 and March 1982.

The same month that Langron began furnishing the IRS with Continental documents, her live-in boyfriend and co-worker at Continental, Brian Morgan, was fired. Although Langron claimed to have no ill feelings toward either defendant for firing Morgan, she did admit that there was a breakdown in her relationship with Feffer in the latter part of 1981. A co-worker of Langron's, Debra Adney, testified that Langron told her that she was "fed-up" with Feffer and that Feffer's firing of Morgan was the "last straw." Adney also claimed that Langron unsuccessfully sought her help in obtaining Continental records twice in January 1982. Roxanne Olding, a bartender who worked for Feffer and had been acquainted with Langron for eight to ten years, testified that one evening in February or March of 1982 Langron told her that she "hated" Feffer and wanted to "get even with him." Langron told Olding that Morgan had been treated unfairly. Feffer himself testified that Langron was very upset over Morgan's firing. He said that at one point Langron threatened to go to the IRS and that he, upon the advice of his lawyer, told Langron to do whatever she felt she had to do. When Feffer was first told that Langron had actually gone to the IRS, however, he claimed that he dismissed the story as rumor. Nonetheless, in March 1982, Langron resigned from Continental after being told that her services were no longer needed.

Agent Collins' testimony[2] was consistent with Langron's. Collins testified that he had advised Langron at the first meeting that he could not encourage her to take any documents, but that it was IRS policy to accept documents voluntarily provided.

Though Langron was never paid a reward for furnishing the IRS with documents, the agents apparently never discouraged her from continuing to do so. According to Collins, he and Langron met six to eight more times after this initial meeting and always at Langron's request. At two of these meetings, Langron provided him with additional company documents and on another occasion she mailed documents to him. Collins testified that he never asked Langron to produce additional documents and that he had no knowledge that she would do so, yet he did admit coming prepared to their second meeting, at Langron's home on December 26, 1981, with a microfilm copier in his car. During the meeting, Langron provided him with Continental's cash reports covering the period from February 1971 to November 1981, in addition to various sales invoices, statements and correspondence relating to three of Continental's accounts.

Collins acknowledged that, after mentioning to Langron that obtaining copies of tax returns from the IRS Kansas City Service Center was a lengthy process, he received copies of Feffer's individual tax returns from Langron in the mail on January 15, 1981. Included with the tax returns were copies of Feffer's checking account stubs and four of his bank deposit slips; copies of envelopes sent to Feffer for rent payments; copies of checks addressed to Continental which Feffer cashed and split with Alter; copies of documents relating to a foreign account; copies of Continental's corporate income tax returns; and a list of the yearly salaries of Alter and Feffer. At their last meeting on March 10, 1982, Langron furnished a copy of a check made out to Continental from Packard Oil Company, two copies of accounts written off by Continental in 1981, and additional copies of invoices, a letter and a check all relating to the foreign account. Collins claimed that the only request he made of Langron during this time was that she prepare a list of all Continental employees' names and their job descriptions. In the meantime, Langron had been made a numbered informant

2. Collins did not testify at the suppression hearing; instead the parties stipulated to relying

upon his testimony from the earlier IRS summons enforcement hearing.

in February 1982 so that, for her protection, any communication regarding Langron would refer only to her assigned number. An official criminal investigation was opened on March 10, 1982, the date on which Langron last submitted Continental documents to the IRS.

In an attempt to show that Langron had been working for the IRS when she furnished it with Continental documents, the defendants presented a letter at the suppression hearing that Langron had written to the Wisconsin Department of Labor Job Service Division on April 16, 1982. In the letter, Langron requested a hearing on her unemployment claim and explained that her employer, Feffer, may have been aware of her "undercover work ... for the Department of Treasury" since she was "viewing and requesting to see many records and documents [Continental was].... not presently working on." At Langron's subsequent unemployment hearing in May 1982, she testified that the IRS agents were "coming to her home on a regular basis" and that they "would indicate that they could use such and such records." She explained, however, that they would never instruct her to obtain specific documents because that would be illegal. She said that the agents also asked that she be as discreet as possible since the IRS did not intend to "move for awhile."

The parties apparently agreed that the documents Langron provided the IRS at the first meeting on December 17, 1981 were the product of a purely private search and thus not subject to fourth amendment constraints. Alter and Feffer claimed, however, that the government's activities following that initial meeting transformed Langron into an instrument or agent of the government, thus making her search governmental in nature and subject to fourth amendment restrictions. The defendants therefore urged that their documents were seized during an unreasonable search and should be suppressed.

The district court rejected the defendants' "instrument or agent" argument. In doing so, the court first considered whether the government knew of or acquiesced in Langron's intrusive conduct. The court concluded that, after the initial meeting, the IRS knew or should have known that Langron would be producing additional documents and that the IRS had acquiesced in this intrusive conduct. Since the court found that the government had at least indirectly encouraged Langron to seize additional Continental documents, it next considered whether Langron had intended to assist the government's efforts or whether she had continued to provide documents in an attempt to further her own ends. The court concluded that Langron's willingness to furnish the IRS with documents in an attempt to protect herself precluded her from becoming a government agent. Since the defendants failed to meet their burden of proving that Langron's search was not purely private, the court denied the motion to suppress. Alter and Feffer appeal.

## II. DISCUSSION

Though individuals have a fourth amendment right to be free from unreasonable searches and seizures by the government, purely private searches are not subject to constitutional restrictions. *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). "The exclusionary rules were fashioned 'to prevent, not repair,' and their target is official misconduct." *Coolidge v. New Hampshire*, 403 U.S. 443, 488, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971) (quoting *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960)). A difficult issue arises, however, once the government is contacted by a private searcher. The government may not do, through a private individual, that which it is otherwise forbidden to do. Accordingly, if in light of all the circumstances a private party conducting a search must be regarded as an instrument or agent of the government, the fourth amendment applies to that party's actions. *Coolidge*, 403 U.S. at 487, 91 S.Ct. at 2048. Our task is to determine whether the district court properly concluded that Langron's search and seizure of the defendants' documents was a purely private act.

In addressing this issue, the district court followed the approach taken by the Ninth Circuit in *United States v. Walther*, 652 F.2d 788 (9th Cir.1981). Though specifically declining to define a standard, *id.* at 791, the *Walther* court approached the "instrument or agent" issue by considering both whether the government knew of and acquiesced in an airport search of a suspicious-looking overnight case and whether the airline employee who conducted the search did so for the purpose of assisting the government. *See also United States v. Black*, 767 F.2d 1334 (9th Cir.1985); *United States v. Snowadzki*, 723 F.2d 1427 (9th Cir.1984); *Gold v. United States*, 378 F.2d 588 (9th Cir.1967). This particular employee had conducted similar searches in the past and had reported any suspicious findings to the Drug Enforcement Administration. Based on this prior contact, the court found it reasonable for the employee to expect a possible reward from the DEA even though the employee had never received one in the past. This, combined with the fact that the employee had not opened the overnight case for any legitimate business reason, convinced the court that he possessed the requisite mental state of a government agent. Moreover, the court found that, because of their previous contact, the DEA either knew or should have known that the employee would continue to perform such searches, yet had not discouraged his conduct. The DEA's apparent acquiescence implicated it in the search, thus making the search subject to fourth amendment constraints. The *Walther* court ultimately held the search unreasonable and the seized drugs properly suppressed.

*Walther* is not inconsistent with the approach taken by this circuit in similar "instrument or agent" cases. In *Knoll Associates, Inc. v. Federal Trade Commission*, 397 F.2d 530 (7th Cir.1968), for example, we required the suppression of documents stolen by a disgruntled employee and furnished to the FTC for its use in a pending prosecution against the employer. Significant there was the fact that the employee had taken the documents for the purpose of furnishing them to the FTC and the fact that the FTC had knowingly approved of the employee's conduct by accepting the documents. *See also United States v. Newton*, 510 F.2d 1149 (7th Cir.1975) (absence of legitimate reason to search luggage to determine ownership where airline employee already knew owner's identity, combined with government involvement, made search governmental in nature). Where the only government involvement was to accept files voluntarily provided by a corporate official, however, we found denial of a suppression motion proper. *See United States v. Billingsley*, 440 F.2d 823 (7th Cir.1971). The fact that the official in *Billingsley* was a custodian of the corporate documents suggested that he had initially obtained the documents for purposes independent of assisting the government. *Id.* at 826. A former employee, in *United States v. Harper*, 458 F.2d 891 (7th Cir. 1971), had retained her copies of company records and had kept them in her possession after she left the defendant's employ. The IRS contacted her eight months later, learned that she had the records, and obtained copies of them from her for use in a tax fraud prosecution. Since the employee had obtained the records without the government's knowledge or inducement, we found that the district court properly admitted the challenged documents. In *United States v. Auler*, 539 F.2d 642 (7th Cir.1976), the telephone company had attached a detecting device on Auler's phone to determine whether he was electronically bypassing the company's billing system when making long-distance calls. The government was unaware of the company's conduct until notified by it later that Auler might have violated federal law. We upheld the search warrant which the government had obtained based upon that information since the company's surveillance had been conducted without government involvement and solely for the purpose of protecting its equipment. *See also United States v. Ziperstein*, 601 F.2d 281, 290 (7th Cir.1979) (alternative holding that search nongovernmental where pharmacist obtained records implicating employer in Medicaid fraud prior to any contact with the government); *United States v. Bulgi-*

*er,* 618 F.2d 472 (7th Cir.1980) (airline employee who found drugs after legitimately opening luggage to determine ownership had conducted private search for business purpose).

 Our review of the foregoing cases makes clear that, as the district court properly found, two critical factors in the "instrument or agent" analysis are whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose for conducting the search was to assist law enforcement efforts or to further her own ends. The court's analysis must be made on a case-by-case basis and in light of all of the circumstances. Nevertheless, it is the movant's burden to establish by a preponderance of the evidence that the private party acted as a government instrument or agent.

 The defendants here argue that the trial court erred in failing to distinguish between the motive and the purpose behind Langron's decision to continue to seize their documents. They assert that, regardless of her motive, Langron's only purpose for taking the documents was to turn them over to the IRS. This purpose, combined with the government's encouragement of her actions, violated the fourth amendment, they argue, thereby requiring suppression of the documents.

The district court found that Langron's fear of being held liable for her part in the tax fraud motivated her to assist the IRS. Thus the court concluded that Langron would have continued her search regardless of the agents' involvement, stating that:

> [I]n reviewing the record it doesn't seem to contain any evidence that a reward was actually offered or that even one was sought, or that the agents in any way promised her immunity. There is every indication in this record that *whatever the motivation,* all of Langron's actions were purely voluntary and not the result of government inducement.

(Emphasis added). It matters not then whether the defendants characterize the inquiry as one into Langron's motive or into her purpose for conducting the search

for in either case the court found her actions to be independent of government involvement.

We will disturb the district court's findings of fact only if clearly erroneous. *United States v. Binder,* 794 F.2d 1195, 1198 (7th Cir.1986). Langron testified that she had participated in the defendants' attempts to defraud the IRS for several years and that, as her involvement increased, she began to fear the possible consequences. After the IRS confirmed her fears through an anonymous phone call, she became anxious to ingratiate herself with the IRS. Agents Collins and Miller both testified that Langron acted out of fear, and this was also the explanation that Langron had given during the unemployment compensation hearing for her problems at work. In addition, there was evidence to suggest that Langron may have also been motivated to provide the IRS with documents by a desire to get even with the defendants for firing her live-in boyfriend. This motivation is consistent with the district court's finding that Langron's actions were not the result of government inducement. Accordingly, we conclude that the court's finding that Langron's motivation was independent of government involvement is not clearly erroneous.

Although the IRS agents' conduct came close to being improper, the district court found that it did not come close enough. At the summons enforcement hearing, both agents Collins and Miller testified that while IRS policy required them to refrain from asking for any documents, it allowed them to accept any provided voluntarily. Collins claimed that he had in fact never requested any documents from Langron and that he did not expect to receive any from her after their first meeting. Nonetheless, Collins testified that he met with Langron several more times, brought a microfilm copier to their second meeting, and later made Langron a numbered informant. Based on these factors, the court found that the agents had at least expected to have further contact with Langron. The court concluded that the "circumstances

strongly suggest[ed] that after the December 17, 1981, meeting, the agents knew, or should have known, that Langron would be producing additional documents, and that they acquiesced in this intrusive conduct." Yet the court found credible the agents' and Langron's testimony that the agents never requested any documents.[3] Moreover, there was no evidence that the agents directly participated in obtaining any of the documents, a fact which the defendants do not dispute. This, combined with Langron's independent motivation for conducting the search, led the district court to conclude that:

> [T]he defendants have not met their burden of proving by a preponderance of the evidence that the records Langron turned over to the IRS should be suppressed because the Court finds that Langron was not motivated by a desire to assist the law enforcement agencies, and because the evidence that the agents actively encouraged Langron's record gathering is not sufficient, and certainly not persuasive.

Our review of the record persuades us that the district court's finding is not clearly erroneous.

We must keep in mind that it is improper conduct on the part of the government which the exclusionary rules were designed to prevent; the rules do not serve to deter the private searcher. So while the agents may have come close to being too receptive and too cooperative in dealing with Langron, the district court did not err in refusing to exclude the fruits of Langron's search once it determined that her search was purely private and not the result of government misconduct. The defendants failed to convince the court otherwise, and we decline to disturb the court's judgment on appeal. By this we do not condone the agents' conduct, however; and we remind

the IRS and its agents that attempts to circumvent the warrant requirements of the fourth amendment through the use of a private party will not be tolerated. The court's order denying the defendants' motion to suppress is hereby

AFFIRMED.

---

**3.** The only evidence presented to suggest that the agents may have requested additional documents was Langron's testimony at her unemployment hearing that the agents would tell her that they could use "such and such records." Langron contradicted this testimony at the suppression hearing, however, claiming that the agents never asked her to obtain additional documents. The district court noted this contradiction and chose to believe the latter version. The defendants now urge us to rely upon Langron's earlier story, but "[t]he credibility of witnesses at a suppression hearing is a matter for the trial judge and his credibility findings will not be reversed unless they are clearly erroneous." *United States v. Binder,* 794 F.2d 1195, 1199 (7th Cir.1986). We conclude that the court's finding here is not clearly erroneous.